USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/16/2020_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
OLGA GONZALEZ,                          :
                                        :
                    Plaintiff,          :
                                        :
          -against-                     :
                                        :
ANDREW M. SAUL,                         :     19-CV-2317 (JLC)
Commissioner, Social Security           :
Administration,[1]                      :
                                        :
                    Defendant.          :
------------------------------------------------------------X


**<u>OPINION AND ORDER</u>**

---

[1] Andrew M. Saul is now the Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Saul is hereby substituted for former Acting Commissioner Nancy A. Berryhill as the defendant in this action.

TABLE OF CONTENTS

I. BACKGROUND ........................................................................................ 1

A.      Procedural Background ................................................................ 1

B.      The Administrative Record ......................................................... 2

1. Gonzalez's Background ................................................................. 2

2. Relevant Medical and Opinion Evidence .................................... 3

a.      Treatment Notes .............................................................. 3

i.      Diagnostic Imaging ............................................... 3

ii.     Dr. Robert Kayal—Orthopedic Surgeon ............... 5

iii.    Dr. Stephen M. Koretsky—Psychologist .............. 7

iv.     Dr. Jeffrey H. Newton—Psychiatrist ..................... 10

v.      Douglas A. Schwartz—Doctor of Osteopathic Medicine ..................... 10

b. Medical Opinion Evidence ............................................. 12

i.      Dr. Edumnd A. Ganal—Orthopedic Surgeon ....... 12

ii.     Dr. Stephen M. Koretsky—Psychologist .............. 13

iii.    Dr. Jeffrey H. Newton—Psychiatrist ..................... 14

iv.     Dr. Naunihal Sachdev Singh—Independent Neurological Evaluator . 15

v.      Dr. Ira Neustadt—Independent Neurological Evaluator ................... 15

vi.     Dr. Solomon Miskin—Independent Medical Examiner ...................... 16

vii.    Dr. Norman Weiss—Independent Psychiatric Evaluator ................... 16

viii.   Dr. Francis A. Pflum—Orthopedic Surgeon ......................... 17

ix.     Dr. Douglas A. Schwartz—Doctor of Osteophathic Medicine.............. 17

x.      Dr. Richard J. Radna—Nuerosurgeon...................... 18

xi.     Dr. Ji Hoon Kim—Independent Chiropractic Examiner ..................... 19

xii.    Dr. Walter L. Nieves—Nuerologist........................ 19

xiii.   Dr. Michael B. Singer—Physician ........................... 20

xiv.    Dr. Robert A. Kayal—Orthopedic Surgeon .......................... 21

xv.     Chiropractor......................................................... 21

xvi.    Dr. Melissa Antiaris—Consultative Examiner (Psychological).............. 22

xvii.   Dr. Julia Kaci—Consultative Examiner (Physical) ........................... 23

i

xviii. State Agency Consultants ............................................. 24

c. Adult Function Report ................................................. 25

3. Hearing Before the ALJ ..................................................... 25

II. DISCUSSION ............................................................................ 29

A. Legal Standards ...................................................................... 29

1. Judicial Review of Commissioner's Determinations ................... 29

2. Commissioner's Determination of Disability .......................... 31

a. Five-Step Inquiry .............................................. 32

b. Duty to Develop the Record ...................................... 33

c. Treating Physician's Rule ....................................... 35

d. Claimant's Credibility .......................................... 38

B. The ALJ's Decision ................................................................. 40

C. Analysis .......................................................................... 45

1. The ALJ Did Not Err in Evaluating Gonzalez's Impairments Under the
Medical Listings ................................................... 46

a. Listing 12.04 ................................................... 47

b. Listing 1.04A ................................................... 52

2. The ALJ's Violations of the Treating Physician Rule Were Harmless ....... 55

a. Dr. Schwartz .................................................... 55

b. Dr. Koretsky .................................................... 61

3. The ALJ Properly Assessed Gonzalez's Credibility ..................... 67

4. The ALJ Fully Developed the Record ................................... 70

III. CONCLUSION ......................................................................... 71

**JAMES L. COTT, United States Magistrate Judge**.

Plaintiff Olga Gonzalez seeks judicial review of a final determination by defendant Andrew M. Saul, the Commissioner of the Social Security Administration, denying Gonzalez's application for a period of disability and disability insurance benefits under the Social Security Act. The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Gonzalez's motion is denied and the Commissioner's cross-motion is granted.

## I. BACKGROUND

### A.    Procedural Background

Gonzalez applied for a period of disability and Disability Insurance Benefits ("DIB") on April 15, 2015, alleging disability beginning December 7, 2014. Administrative Record ("AR"), Dkt. No. 11, at 30. The Social Security Administration ("SSA") denied Gonzalez's claim on October 9, 2015. *Id.* On October 23, 2015, Gonzalez requested a hearing before an Administrative Law Judge ("ALJ"), and on August 28, 2017 a hearing was held before ALJ Sharda Singh. *Id.* at 30, 374. At the hearing, testimony was taken from Gonzalez, represented by counsel Patty Costa, and vocational expert Christine Ditrinco. *Id.* at 374–404. In a decision dated December 27, 2017, the ALJ concluded that Gonzalez was not disabled, as defined in the Social Security Act, from December 7, 2014 through the date of the decision. *Id.* at 30–41. Gonzalez sought review of the ALJ's decision by

1

the SSA Appeals Council on January 4, 2018.  *Id.* at 5.  This request was denied on
February 19, 2019, rendering the ALJ's decision final.  *Id.* at 1–4.

 Represented by Joseph Romano, Gonzalez timely filed the present action on
March 14, 2019, seeking judicial review of the Commissioner's decision pursuant to
42 U.S.C.A. § 405(g).  Complaint, Dkt. No. 1 at 1.  On April 30, 2019, the parties
consented to my jurisdiction for all purposes under 28 U.S.C. § 636(g).  Dkt. No. 10.
The Commissioner answered Gonzalez's complaint by filing the Administrative
Record on June 20, 2019.  Dkt. No. 11.  On August 19, 2019, Gonzalez moved for
judgment on the pleadings, seeking reversal of the Commissioner's decision and
remand for further administrative proceedings.  Motion for Judgment on the
Pleadings, Dkt. No. 13; Memorandum of Law in Support of Motion ("Pl. Mem."),
Dkt. No. 14 at 3, 28–29.  The Commissioner cross-moved for judgment on the
pleadings on October 29, 2019.  Motion for Judgment on the Pleadings, Dkt. No. 19;
Memorandum of Law in Support of Motion ("Def. Mem."), Dkt. No. 20 at 1.  No reply
papers were filed.

## B. The Administrative Record

### 1. Gonzalez's Background

 Gonzalez was born on February 12, 1967, and is currently 53 years old.  Pl.
Mem. at 3.  At the time of her hearing on August 28, 2017, Gonzalez lived with her
son, who was 14 years old, and her mother, who was 73 years old, in Haverstraw,
New York.  AR at 389–90, 405, 520.  She completed high school and was employed
as a housekeeper and a housekeeping supervisor from January 2004 until

December 2014.  *Id.* at 390, 417, 630.  Gonzalez stopped working after suffering an injury on October 8, 2014, when she reached up to clean some blinds and felt a pain and crack in her back on the right side; the pain later became so intense that she "felt like [she] couldn't breathe."  *Id.* at 559, 630.  The persistent pain in her back, neck, and shoulder, as well as numbness in her right leg, prevented her from returning to work.  *Id.* at 380, 630.  Although Gonzalez managed to work in December 2014 for three days, the resultant pain caused her to become bedridden for several days thereafter.  *Id.* at 380, 630.

Gonzalez also suffers from depression secondary to her physical ailments and sees a psychologist weekly.  *Id.* at 32, 391.  She has a driver's license and is able to drive herself to nearby doctor's appointments about four times a week.  *Id.* at 392.  She can no longer attend religious services, as they involve sitting for too long, and does not visit friends or relatives or go on long distance trips.  *Id.* at 393.  Gonzalez's mother takes care of household chores, such as cooking, laundry, grocery shopping, and cleaning.  *Id.*

### 2.  Relevant Medical and Opinion Evidence

#### a.  Treatment Notes

##### i.      Diagnostic Imaging

Upon referral by orthopedic surgeon Dr. Robert Kayal, Dr. John M. Athas of Franklin Lakes MRI conducted a magnetic resonance imaging ("MRI") examination of Gonzalez's lumbar spine on November 7, 2014, and found moderate facet arthropathy at L5-S1 and L2-L3, and severe facet arthropathy at L4-L5.  AR at

3

593–94.[2]  On the same day, an MRI examination of Gonzalez's thoracic spine was taken and, based on Dr. Kayal's review, it showed T9/10 focal left foraminal disc herniation and encroachment of the left T9 nerve.  *Id.* at 608.[3]  A November 3, 2014 x-ray of the lumbar spine revealed "loss of lordosis, [and] mild degenerative changes."  *Id.*

On February 27, 2015, electromyogram ("EMG") and nerve conduction studies reviewed by pain management specialist Dr. Irfan A. Alladin demonstrated right acute C6/7 radiculitis and evidence of cervical root irritation, bilateral median neuropathy, and mild carpal tunnel syndrome on the right.  *Id.* at 597.[4]  Dr. Alladin recommended physical therapy and a home exercise program, vitamin B6 for nerve

---

[2] "Facet joint arthrosis is a pathological process involving the failure of the synovial facet joints.  Degenerative changes begin with cartilage degradation, leading to the formation of erosions and joint space narrowing, and eventually sclerosis of subchondral bone."  *Lumbar Facet Arthropathy,* U.S. NATIONAL LIBRARY OF MEDICINE: NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, https://www.ncbi. nlm.nih.gov/books/NBK538228/ (last visited Sept. 15, 2020).

[3] "A herniated (slipped) disk occurs when all or part of a disk is forced through a weakened part of the disk."  *Herniated disk,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/ency/article/000442.htm (last visited Sept. 15, 2020).

[4] Radiculitis refers to inflammation of the nerve root.  *Radiculitis,* U.S. NATIONAL LIBRARY OF MEDICINE: NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, MEDGEN, https://www.ncbi.nlm.nih.gov/medgen/11099 (last visited Sept. 15, 2020).

Median neuropathy is a "[d]isease involving the median nerve, from its origin at the BRACHIAL PLEXUS to its termination in the hand.  Clinical features include weakness of wrist and finger flexion, forearm pronation, thenar abduction, and loss of sensation over the lateral palm, first three fingers, and radial half of the ring finger."  *Median Neuropathy,* U.S. NATIONAL LIBRARY OF MEDICINE: NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, MEDGEN, https://www.ncbi.nlm.nih.gov/ medgen/199766 (last visited Sept. 15, 2020).

regrowth, carpal tunnel splints, and anti-inflammatory medications.  *Id.*  A May 1, 2015 EMG and nerve conduction study analyzed by Dr. Alladin was consistent with right acute L5 radiculopathy.  *Id.* at 984.  Upon referral by neurologist Dr. Walter L. Nieves, Dr. Anand Kakkanati analyzed an MRI of Gonzalez's cervical spine several months later, on September 30, 2015, which showed several posterior disc herniations but did not reveal "significant spinal canal stenosis" or other complications.  *Id.* at 661–62.[5]  On August 4, 2016, orthopedic surgeon Dr. Francis A. Pflum analyzed MRIs of the thoracic and cervical spines, which showed several disc herniations and a T10-11 broad-based posterior bulge.  *Id.* at 883.

### ii.     Dr. Robert Kayal—Orthopedic Surgeon

Gonzalez presented to orthopedic surgeon Dr. Robert Kayal on several occasions between November 3, 2014 and August 28, 2015 with mid- and lower-back pain.  *Id.* at 605–25; 1128–49.  On November 3, 2014, Gonzalez described pain "centralized to the thoracic spine with radiation down the lumbar spine."  *Id.* at 605.  She had been prescribed oral medication, but it "made her [feel] disoriented and did not help with the pain."  *Id.*  On November 19, 2014, Gonzalez reported that she was "working a lot" and continued to feel soreness in her back that was aggravated when she coughed or took a deep breath.  *Id.*  Dr. Kayal authored a doctor's note on November 21, 2014, which restricted Gonzalez to "light duty" work.  *Id.* at 626.  On

---

[5] Spinal stenosis is a "narrowing of the spaces within your spine."  *Spinal Stenosis,* MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited Sept. 15, 2020).

December 9, 2014, Gonzalez reported that she had experienced a "terrible reaction" to Ultram, a pain medication, which resulted in her fainting. *Id.* at 610.

The following month, on January 6, 2015, Gonzalez reported that she felt "slightly better" with physical therapy, but had not returned to work as her job required "heavy lifting and standing for [] long periods of time." *Id.* at 605, 608, 610. She was diagnosed with lumbar and thoracic intervertebral disc disorder with displacement, and Dr. Kayal recommended physical therapy and epidural injections for her pain. *Id.* at 605, 608–09. On February 10, 2015, Gonzalez reported that her symptoms had become more severe since her last visit, and although she had been attending physical therapy two to three times per week, therapy had "aggravated her symptoms." *Id.* at 610–11.

Gonzalez returned to Dr. Kayal on April 8, 2015, after receiving one epidural injection with minimal relief and remaining compliant with physical therapy. *Id.* at 616. Dr. Kayal observed that Gonzalez had a normal gait and full motor strength in the upper and lower extremities, but tenderness in the thoracic and lumbar spine, with pain on forward flexion, and weakness in the right lower limb to hip flexion and plantar flexion. *Id.* at 618. He recommended that she complete the series of three injections and "give time for [them] to work." *Id.* at 619. On April 24, 2015, Gonzalez's lower back pain had improved but her mid-back pain persisted. *Id.* at 621. Dr. Kayal recommended that she continue chiropractic and physical therapy and return to light duty work only. *Id.* at 624. On June 9, 2015, Gonzalez reported persistent back pain but denied lower extremity weakness, numbness, or bladder or

bowel dysfunction.  *Id.* at 1131.  The following month, on July 14, 2015, she had "completed 3 lumbar epidural injections and has had only minimal relief."  *Id.* at 1137.  On August 25, 2015, Gonzalez's pain persisted, but she maintained full strength in her bilateral lower extremities.  *Id.* at 1143, 1147.

### iii.   Dr. Stephen M. Koretsky—Psychologist

Dr. Stephen M. Koretsky, Ph.D., a New York State ("NYS") licensed psychologist, treated Gonzalez with psychotherapy for more than two years beginning on May 18, 2015, when he diagnosed her with major depressive disorder. *Id.* at 630–33.  Dr. Koretsky saw Gonzalez approximately once every two weeks between June and August 2015.  *Id.* at 650–51.  She was frequently discouraged, anxious, and depressed, and expressed constant pain.  *Id.*  On June 30, 2015, Gonzalez told Dr. Koretsky that she had gone to the hospital because her pain was so intense, and the following month stated that she "has not wanted to leave the house, except to go to doctor's [appointments]."  *Id.* at 651.  On August 6, 2015, Dr. Koretsky "[e]xplored a referral to [a] psychiatrist," but Gonzalez was "extremely reluctant" to go.  *Id.*  The following week she reported that she was "getting worse." *Id.* at 650.

Gonzalez increased the frequency with which she saw Dr. Koretsky in the latter half of 2015, attending psychotherapy sessions with him once or twice per week.  *Id.* at 683–91.  On September 9, 2015, Gonzalez stated that she had received a report from her orthopedic doctor authorizing her to return to "some work," which "discourage[d] and upset[] her as she [felt] barely able to function with daily life,

much less return to work." *Id.* at 691.  On September 24, 2015, she was "depressed and discouraged" and stated that the treatment she received "only helps for a little bit." *Id.* at 690.  On October 7, 2015, she told Dr. Koretsky that she had stayed in bed for four days crying, but on October 9, 2015 Dr. Koretsky observed that she "looked better" than she had in the previous session.  *Id.* at 688.  On October 22 and 23, 2015, Gonzalez reported being "confused" about the fact that Dr. Nieves told her "that her injuries should not be causing the pain she is having," and that she was in "severe pain and discomfort."  *Id.* at 687–88.  Gonzalez described to Dr. Koretsky on November 12, 2015 that she had received a facet block injection which caused her to be taken to St. Joseph's Medical Center, where she received cardiopulmonary resuscitation ("CPR") and was intubated.  *Id.* at 685–86.  Gonzalez suffered from chest pain and difficulty breathing following the experience, and feared receiving another injection.  *Id.*  Dr. Koretsky described her as "very teary" on December 31, 2015 and January 7, 2016.  *Id.* at 683, 727.

On January 15, 2016, Gonzalez described "hear[ing] a voice" when in bed, and was "not sure if she [was] asleep or not when [it] occur[ed]"; Dr. Koretsky changed her diagnosis from "Major Depressive Disorder, single episode" to "Major Depressive Disorder with Psychotic Features, single episode." *Id.* at 727.  The following month, on February 18, 2016, Gonzalez again reported becoming frightened by voices she heard as she was going to sleep "saying 'you are going to die-you are going die.'" *Id.* at 730.  In March 2016, after beginning to take antidepressant medication and increasing her dosage under the care of Dr. Newton,

Gonzalez reported feeling "a little better" but continued to have crying spells.  *Id.* at 732–33.  In April 2016, Gonzalez told Dr. Koretsky the medication helped with the voices she had been hearing.  *Id.* at 734–35.  On May 5, 2016, Gonzalez felt the Duloxetine was "making a little bit of difference—not too much" and Dr. Newton had prescribed an additional medication.  *Id.* at 737.  She had some issues in filling her prescriptions due to some confusion with her insurance, which persisted for about a month.  *Id.* at 736–37, 739.  While unable to fulfill her prescriptions, Gonzalez reported that she heard "'someone call [her] name and [thought] someone [was] behind [her]'" adding that her week was "terrible without the medication."  *Id.* at 739.  On July 21, 2016, Gonzalez told Dr. Koretsky she was eager to try surgery if it could "maybe [give] half of [her] life back."  *Id.* at 740.  Dr. Koretsky wrote that she "seem[ed] to be getting more depressed and discouraged about her situation" in August 2016.  *Id.* at 1106.

On September 29, 2016, Gonzalez was "[t]eary and discouraged" that she was "still in pain and unable to work."  *Id.* at 1101.  The following month, on October 28, 2016, Dr. Koretsky wrote that her depression was "worsening," and recommended therapy twice a week.  *Id.* at 1098.  On November 23, 2016, Dr. Koretsky observed that Gonzalez "look[ed] disheveled today" and wore slippers to the office.  *Id.* at 1096.  Dr. Koretsky wrote on December 1, 2016 that Gonzalez had obtained scores in several evaluations indicating severe depression and anxiety.  *Id.* at 894.  Gonzalez told Dr. Koretsky on January 5, 2017 that she "still hears voices at times,"

despite beginning to take Cymbalta in addition to buproprion.  *Id*. at 1066.[6]  In April 2017, she reported difficulty sleeping due to pain, and said she spent "most days in bed till 3 PM."  *Id*. at 1078.  Gonzalez also expressed feelings of depression and hopelessness in June and July 2017 and appeared to be "very upset."  *Id*. at 1071.

### iv.    Dr. Jeffrey H. Newton—Psychiatrist

Upon referral from Dr. Koretsky, Gonzalez met with psychiatrist Jeffrey H. Newton on February 29, 2016.  *Id*. at 844–45.  She told Dr. Newton that she "heard voices after [her] accident telling her, '[y]ou're going to die.'"  *Id*. at 845.  He noted that she was "clearly depressed" and in physical pain, but was friendly and cooperative and "related her history in a clear and coherent manner."  *Id*. at 846. On June 27, 2016, Dr. Newton saw Gonzalez again and wrote that she was "in a depressed state," as she was in chronic pain and concerned about her inability to work and the worker's compensation process.  *Id*. at 844.  He prescribed her bupropion and duloxetine as a "medically necessary treatment of her causally related adjustment disorder with depressed mood."  *Id*.

### v.  Douglas A. Schwartz—Doctor of Osteopathic Medicine

Douglas A. Schwartz, D.O., a physical medicine & rehabilitation specialist, conducted an initial examination of Gonzalez on November 18, 2016.  *Id*. at 919–20. Gonzalez presented with persistent neck and low back pain and stiffness, numbness

---

[6] Buproprion is used to treat Seasonal Affective Disorder and is an antidepressant. *Buproprion,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a695033.html (last visited Sept. 15, 2020).

and tingling in the right arm and leg, intermittent spasms to those areas, interrupted sleep, and difficulty with lifting, carrying, pushing, and pulling.  *Id.* at 919.  Gonzalez demonstrated pain on palpation of the right cervical and lumbosacral spine, and had a slightly impaired range of motion in flexion and extension, bilateral bending, and left/right rotation.  *Id.*  She showed no atrophy in her upper or lower extremities and ambulated with a normal gait.  *Id.* at 919–20.  Dr. Schwartz found positive straight leg raise test on the right side and lumbosacral nerve root irritation.  *Id.* at 920.  He diagnosed Gonzalez with:

> [c]ervical derangement with myofasciitis with probably underlying radiculopathy with posterior disk herniation at C4-5, C5-6, C6-7, which contacts the cervical cord; [and] lumbosacral derangement with myofasciitis with probable underlying radiculopathy with L2-3 facet arthropathy and a small disk bulge, L4-5 severe facet arthropathy and small disk bulge, and [] mild spinal stenosis and bilateral neural foraminal narrowing; L5-S1 moderate facet arthropathy.

*Id.*

At a February 4, 2017 follow-up evaluation, Gonzalez presented with slightly increased pain levels (35 out of 100), and Dr. Schwartz made the same findings and diagnoses as detailed in his November 2016 appointment.  *Id.* at 923–24.  He recommended that the Worker's Compensation Board authorize upper/lower electrodiagnostic and cervical/lumbosacral MRI studies to evaluate for radiculopathy and/or disc pathology, and referred Gonzalez to a spinal surgeon and pain management specialist, for re-evaluation when necessary.  *Id.* at 924.

On April 1, 2017, Dr. Schwartz conducted upper/lower nerve conduction and needle electrodiagnostic studies of Gonzalez with the following impressions:

"[E]vidence of RT, L5, L5 radiculopathy with denervation noted to the RT ECRB, TIBIALIS ANTERIOR, EHL muscles.  Reduced amplitudes and prolonged distal latencies [and] right carpal tunnel syndrome . . . ."  *Id.* at 927–35.  He diagnosed Gonzalez with cervical discitis, cervical radiculopathy, lumbar discitis, and lumbar radiculopathy, with a "guarded" prognosis for recovery.  *Id.* at 915, 917.

### b. Medical Opinion Evidence

#### i.  Dr. Edumnd A. Ganal—Orthopedic Surgeon

On March 31, 2015, orthopedic surgeon Edmund A. Ganal conducted an independent medical examination for the NYS Worker's Compensation Board.  *Id.* at 600–04, 742–49.  Examination of the cervical and lumbar spines revealed tenderness upon palpation, but no spasm, and slightly reduced range of motion.  *Id.* at 602.  Gonzalez had full motor strength and no evidence of muscle atrophy.  *Id.* She was diagnosed with cervical, thoracic, and lumbar spine strain.  *Id.* at 603. During a re-examination of Gonzalez on August 18, 2015, Dr. Ganal diagnosed her with thoracic and lumbar spine strain.  *Id.* at 763–67.  At both appointments, Dr. Ganal recommended physical therapy three times a week and found evidence of a mild (25 percent) orthopedic disability.  *Id.* at 603, 766.  He also opined on both occasions that she was capable of returning to work on light duty employment, except that she could not lift objects greater than 20 pounds, walk or stand for a prolonged period, climb stairs or vertical ladders, or bend repetitively.  *Id.*

12

ii.     Dr. Stephen M. Koretsky—Psychologist

Dr. Koretsky prepared a narrative report for Gonzalez on May 18, 2015.  *Id.*
at 630–33.  He reported that, during his first consultation with Gonzalez on May 7,
2015, she described being in constant pain, and as a result of the pain, suffered from
severe depression and anxiety.  *Id.* at 631.  He conducted several evaluations, which
demonstrated that Gonzalez suffers from severe depression, anxiety, and
somatization.  *Id.*  In particular, her depression and anxiety scores were "above
average for pain patients," with only three percent of pain patients scoring at her
level or higher.  *Id.* at 632.  In terms of somatization, Gonzalez showed "an unusual
number of physical problems and preoccupations with pain, physical symptoms, and
other health-related issues."  *Id.*  Dr. Koretsky diagnosed Gonzalez with major
depressive disorder, single episode, and recommended psychotherapy once or twice
per week to alleviate her symptoms.  *Id.* at 633.  He opined that her symptoms were
caused "by the accident and injury of April 17, 2010,"[7] and found her "disability
related to [his] field of specialty (Psychology) to be total"; her prognosis was "poor
without amelioration of her pain syndrome."  *Id.*

Dr. Koretsky also prepared a doctor's report for the Worker's Compensation
Board, accompanied by a narrative report, on December 1, 2016.  *Id.* at 891–95.  He
opined that she "continue[d] to be depressed" and to experience "auditory

---

[7] This date appears to be a typographical error, as Dr. Koretsky acknowledged on
the first page of his report that Gonzalez's accident and injury occurred on October
8, 2014.  *See* AR at 630.  The April 7, 2010 date does not appear to be a date of
significance anywhere else in the record.

hallucinations." *Id.* at 894.  He determined Gonzalez "is in constant pain and discomfort . . . [and] has difficulty concentrating and attending to task." *Id.*

On August 3, 2017, Dr. Koretsky prepared a medical source statement opining that Gonzalez "hears voices at times, is depressed, unable to concentrate [and has] difficulty remembering & attending to task." *Id.* at 972.  He concluded that she is extremely limited in her ability to make judgments on simple and work-related decisions and carry out complex instructions; markedly limited in the ability to understand and remember complex instructions; and moderately limited in the ability to understand and remember simple instructions and carry out simple instructions.  *Id.*  He determined that Gonzalez is extremely restricted in her ability to respond appropriately to usual work situations and to changes in a routine work setting and markedly restricted in her ability to interact appropriately with the public, supervisors, and co-workers.  *Id.* at 973.  He also concluded that her memory, concentration, and attention to task are additionally impaired.  *Id.*

### iii.   Dr. Jeffrey H. Newton—Psychiatrist

Dr. Jeffrey H. Newton submitted an initial report to the Worker's Compensation Board on June 27, 2016.  *Id.* at 840–43.  Dr. Newton diagnosed Gonzalez with adjustment disorder with depressed mood.  *Id.* at 840.  He wrote that Gonzalez was 100 percent temporarily impaired by her depression, with an uncertain prognosis, and believed that she could not return to work because of "primary physical (as well as secondary psychological) impairment."  *Id.* at 842–43.  Dr. Newton opined that Gonzalez's bupropion medication "regimen clearly need[ed] to be ramped up a little" and doubled her dosage.  *Id.* at 844.

14

### iv.    Dr. Naunihal Sachdev Singh—Independent Neurological Evaluator

Dr. Naunihal Sachdev Singh conducted an independent neurological evaluation on May 10, 2016.  *Id.* at 822.  Dr. Singh's examination of Gonzalez's cervical and lumbar spine showed no tenderness or spasm on palpation and slightly limited range of movement, with limited right shoulder flexion and abduction.  *Id.* at 824–25.  Dr. Singh found full muscle strength, intact sensation, normal muscle tone, and deep tendon reflexes.  *Id.* at 825–26.  He diagnosed resolved cervical and lumbar spine sprain and strain, with underlying osteoarthritis and degenerative disc disease of the cervical and lumbar spine, *id.* at 826, and wrote that there was "no need for causally related treatment, diagnostic testing, or [neurological] follow-up . . . ."  *Id.* at 827.

### v.    Dr. Ira Neustadt—Independent Neurological Evaluator

Dr. Ira Neustadt conducted an independent neurological evaluation of Gonzalez on October 28, 2016.  *Id.* at 861–65.  He found that Gonzalez had an "exaggerated[,] very slow[, and] inconsistent gait" that appeared to improve when she was leaving the office; Gonzalez was observed to rise and sit with great difficulty, but appeared to have greater range of motion when getting off the examining table than on formal testing.  *Id.* at 863.  He opined that she demonstrated "significant symptom embellishment and functional overlay," *id.* at 864, and that she could return to work without restrictions, *id.* at 865.

15

### vi.   Dr. Solomon Miskin—Independent Medical Examiner

Dr. Solomon Miskin completed an independent medical examination of Gonzalez for the Worker's Compensation Board on November 25, 2015.  *Id.* at 777–86.  Dr. Miskin examined Gonzalez on November 20, 2015.  *Id.* at 779–80.  He wrote that Gonzalez was "under the care of Steven Koretsky, Ph.D., with whom she meets every week" although she "demurred psychiatric consults out of fear that she may lose custody of her children."  *Id.* at 780.  During a mental status examination, Gonzalez presented with "no overt evidence of a thought disorder," and she had cooperative behavior, good comprehension, appropriate affect, good insight and judgment, and normal thought processes.  *Id.* at 782.  He diagnosed Gonzalez with adjustment disorder with "mixed anxiety and depressed mood; mild in severity" and concluded that there was no evidence of major depressive disorder.  *Id.*  Dr. Miskin opined that Gonzalez had a "mild partial psychiatric disability," and although she "would not be a candidate for attempting safety sensitive tasks such as heavy lifting or working at heights above the ground," he found "no indication for other restrictions."  *Id.* at 783.  He recommended that she continue outpatient psychiatric therapy and opined that her prognosis was "fair to favorable."  *Id.*

### vii.   Dr. Norman Weiss—Independent Psychiatric Evaluator

Dr. Norman Weiss conducted an independent psychiatric evaluation of Gonzalez on July 22, 2016 and reviewed her medical records.  *Id.* at 849–51.  He found that her memory was intact for recent and remote events, although her mood

was "clearly depressed, and on several occasions she began to cry as she described her situation." *Id.* at 850.  He opined that "[i]f her physical symptoms were resolved, her depression would resolve.  There is no psychiatric reason that she could not return to work without restriction." *Id.*

### viii.   Dr. Francis A. Pflum—Orthopedic Surgeon

Orthopedic Surgeon Francis A. Pflum examined Gonzalez on August 4, 2016 and completed a Doctor's Initial Report for the Worker's Compensation Board August 10, 2016.  *Id.* at 877–84.  Upon physical examination, Gonzalez had "a positive Spurling's test to the right and left," and "decreased range of motion in all parameters secondary to pain." *Id.* at 883.  She exhibited a fair range of motion in her cervical spine but decreased sensation in the right upper extremity and tenderness in the dorsolumbar area.  *Id.*  Dr. Pflum recommended that Gonzalez obtain electrodiagnostic testing results of her spine and extremities for review and follow-up "relative to the possibility of surgical intervention." *Id.*  Dr. Pflum diagnosed Gonzalez with low back pain, cervicalgia, other cervical disc displacement (mid-cervical region), and other intervertebral disc displacement (thoracic region) and opined that she was 100 percent temporarily impaired.  *Id.* at 878–80.

### ix.   Dr. Douglas A. Schwartz—Doctor of Osteophathic Medicine

On November 18, 2016 and February 4, 2017, Dr. Schwartz "[r]ecommended [that Gonzalez] seek employment in a full-time, light-duty capacity, sedentary position only," *id.* at 920, adding that "[s]he remains total[ly] disabled from her previous level of work as a housekeeping employee," *id.* at 924.  He also opined that

17

she could occasionally lift, carry, push, and pull 10 pounds; stand for 15 to 30 minutes with frequent breaks; walk five to 10 minutes occasionally, and occasionally climb stairs, but never climb ladders.  *Id.*  He concluded that she should avoid kneeling, bending, stooping, or squatting; exposure to extreme temperatures; high humidity; environmental hazards; and operating heavy machinery.  *Id.*  Although Gonzalez could occasionally use mass transportation, Dr. Schwartz recommended that she be driven by another person when traveling by motor vehicle.  *Id.*  In his April 1, April 13, and June 3, 2017 reports to the Worker's Compensation Board, Dr. Schwartz opined that Gonzalez's workplace incident was the competent medical cause of her injury, her complaints were consistent with the history of her injury, and she was 75 percent temporarily impaired.  *Id.* at 917, 922, 937.  He did not opine as to whether she could return to work.  *Id.* at 918, 922, 937.

### x.      Dr. Richard J. Radna—Neurosurgeon

Neurosurgeon Richard J. Radna, M.D., performed an initial evaluation of Gonzalez on December 13, 2016.  *Id.* at 951–57.  He found a "severe bilateral paravertebral spasm in the cervical and lumbo-sacral regions, with severely diminished range of motions."  *Id.* at 953.  Review of her MRIs revealed herniated discs in the C4/5, C5/6, and C6/7 levels of the cervical spine; desiccative changes in the lumbar spine; and generalized spinal stenosis throughout the thoracic spine, without any profound focal impingement.  *Id.* at 954.  A scan of the lumbo-sacral spine showed "discogenic and osseous lateral recess stenosis."  *Id.* at 957.  Following this evaluation, Dr. Radna opined on December 15, 2016 that Gonzalez was 100 percent impaired as a result of her injury.  *Id.* at 948.  He recommended a custom-

made cervical collar, physical therapy, and pain management, and concluded that Gonzalez could not return to work due to cervical and lumbo-sacral radiculopathy. *Id.* at 948–49.

Dr. Radna conducted follow-up evaluations of Gonzalez on April 11, 2017 and July 10, 2017, at which he observed persistent cervical and thoraco-lumbar pain, radicular symptoms, and a severely diminished range of motion. *Id.* at 962, 969–70. On April 19, 2017 and August 1, 2017, Dr. Radna prepared additional reports for the Worker's Compensation Board opining that Gonzalez was 100 percent disabled due to her cervical and lumbo-sacral radiculopathy. *Id.* at 958–61, 965–68.

### xi.     Ji Hoon Kim, D.C.—Independent Chiropractic Examiner

On January 11, 2017, Chiropractor Ji Hoon Kim performed an examination of Gonzalez. *Id.* at 789–93. Dr. Kim found reduced range of motion in the cervical and lumbar spine, but no tenderness to palpation, intact sensation, normal strength in all major muscle groups, and no evidence of muscle atrophy. *Id.* at 792. Gonzalez was diagnosed with thoracic and lumbar spine strain; Dr. Kim opined that she "demonstrated poor effort during testing," and was "capable of working and carrying out her activities of daily living without restrictions." *Id.* at 793.

### xii.    Dr. Walter L. Nieves—Neurologist

Neurologist Walter L. Nieves, M.D., completed a Doctor's Progress Report for the Worker's Compensation Board on October 19, 2016. *Id.* at 1119–24. He diagnosed Gonzalez with lower back pain and cervicalgia, and opined that

Gonzalez's complaints are consistent with the history of the injury. *Id.* at 1120–21.[8] Dr. Nieves found Gonzalez to have a 100 percent temporary impairment. *Id.* at 1121.[9]

**xiii. Dr. Michael B. Singer—Physician**

Physician Michael B. Singer examined Gonzalez and completed reports for the Worker's Compensation Board on December 15, 2016 and December 27, 2016. *Id.* at 896–913.[10] On December 13, he diagnosed Gonzalez with pain in thoracic spine, spondylolysis (cervical region), and cervicalgia. *Id.* at 897. At the subsequent consultation, Dr. Singer diagnosed Gonzalez with spondylolysis (cervical region), mid-cervical disc disorder (unspecified), other cervical disc displacement (unspecified cervical region), and spinal stenosis (cervical redion). *Id.* at 909. He rendered x-rays of her cervical and thoracic spine and identified cervical discogenic spondylosis "most severe at the C6-7 level" and 12 rib-bearing thoracic vertebral bodies. *Id.* at 901–02. Dr. Singer also performed a computerized tomography ("CT") scan of the cervical spine, through which he found cervical discogenic spondylosis "most severe at the c6-7 level [where] there is loss of disc material." *Id.* at 913. In

[8] Cervicalgia is an alternative name for neck pain. *Neck Pain or Spasms – Self Care,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/ency/patientinstructions/000802.htm (last visited Sept. 15, 2020).

[9] The handwritten notes accompanying Dr. Nieves' report are largely illegible. *Id.* at 1122–23.

[10] The ALJ and other documents in the administrative record refer to Dr. Singer as "Dr. Barry" and "Dr. Michael Singer Barry," (*id.* at 37, 896), but the correct name, as written by the doctor himself, appears to be Dr. Michael B. Singer. *Id.* at 897, 900–03, 906, 908–09, 912–13.

both reports, Dr. Singer opined that Gonzalez was 100 percent temporarily impaired and could not return to work.  *Id.* at 899–900, 905–06, 911–12.

### xiv.   Dr. Robert A. Kayal—Orthopedic Surgeon

Dr. Kayal authored a doctor's note on November 21, 2014 stating that Gonzalez could return to work ("restricted to light duty") until her next office visit, on December 9, 2014.  *Id.* at 626.  A similar letter, in which the date is not legible, extended that restriction until February 3, 2015.  *Id.* at 627.  The administrative record includes two additional letters written by Dr. Kayal, dated December 9, 2014 and February 10, 2015, excusing Gonzalez from all work until January 6, 2015 and March 24, 2015, respectively.  *Id.* at 628–29.  On January 6, 2015, Dr. Kayal opined that Gonzalez "may return to work at this point with light duties only.  *Id.* at 609.  However, on February 10, April 8, and April 14, 2015, Dr. Kayal opined that, "due to her decline within the last few weeks, [Gonzalez] is not able to work."  *Id.* at 614, 619, 624.  On April 24, 2015, Dr. Kayal wrote that Gonzalez had received a lumbar epidural injection had provided "minimal relief," and wrote that she was unable to return to work given her recent decline, but also "recommend[ed] that she may return to light duty only."  *Id.* at 624.

### xv.   Unknown Chiropractor

On December 2, 2015, an unknown chiropractor completed a medical source statement opining that Gonzalez was totally restricted from lifting/carrying, and that her standing and/or walking, sitting, and pushing and/or pulling capabilities

21

were affected by her impairment.  *Id.* at 663–64.[11]  The chiropractor further
concluded that Gonzalez could never climb, kneel, crouch, crawl, or stoop; could
occasionally balance; and was limited in her ability to reach, handle, and finger, but
not feel.  *Id.* at 664–65.  Finally, the chiropractor opined that Gonzalez's ability to
maintain attention and concentration on work tasks throughout an eight-hour day
were significantly compromised by pain, prescribed medication, or both.  *Id.* at 665.

### xvi.   Dr. Melissa Antiaris—Consultative Examiner (Psychological)

Melissa Antiaris, Psy.D., conducted a psychiatric evaluation of Gonzalez on
September 4, 2015.  *Id.* at 652–56.  Gonzalez reported difficulties falling asleep,
weight gain and fluctuating appetite, and depressive symptoms beginning in
November 2014 after her injury at work.  *Id.* at 652.  She stated that she "feels sad
every day" and experiences "social withdrawal and crying spells."  *Id.* at 652–53.
Gonzalez also reported difficulties with her short-term memory and concentration
since her accident.  *Id.* at 653–54.

A mental status examination revealed dysphoric affect and euthymic mood,
but Gonzalez was cooperative, related adequately, spoke fluently and clearly,
appeared well groomed with normal posture and motor behavior, appropriate eye
contact, had coherent and goal-directed thought processes and exhibited no evidence
of hallucinations, delusions, or paranoia.  *Id.* at 653.  Dr. Antiaris found mild
impairments in attention, concentration and recent and remote memory skills; her

---

[11] The chiropractor's name is not listed on the document and the signature is
illegible.  *See id.* at 666.

cognitive functioning was "in the borderline range" and her insight and judgment were fair.  *Id.* at 654.  Gonzalez was diagnosed with unspecified depressive disorder. *Id.* at 655.  Dr. Antiaris opined that there were "no limitations in [her] ability to follow and understand simple directions and instructions and perform simple tasks independently."  *Id.*  She found mild limitations in Gonzalez's ability to maintain attention, concentration, and a regular schedule, or learn new tasks or perform complex tasks independently and appropriately deal with stress.  *Id.*  Dr. Antiaris concluded that Gonzalez had no limitations in her ability to make appropriate decisions or relate adequately with others.  *Id.*

### xvii. Dr. Julia Kaci—Consultative Examiner (Physical)

Julia Kaci, M.D., a family medicine physician, conducted a consultative examination of Gonzalez on September 4, 2015.  *Id.* at 657–60.  Gonzalez complained of constant neck and right shoulder pain, with pressure radiating to the right upper extremity, and "low back pain" at an 8/10 intensity.  *Id.* at 657.  She "appeared to be in no acute distress," although her gait was slow and she was "[u]nable to walk on her heels because she felt unbalanced," so she walked on her toes.  *Id.* at 658.   She exhibited limited range of motion in the cervical and lumbar spine bilaterally, tenderness on palpation to the cervical spine, positive straight leg raising tests, and limited range of motion in her right upper extremity.  *Id.* at 659. She also had decreased sensation to light touch in the right upper and lower extremities.  *Id.*  Dr. Kaci diagnosed Gonzalez with chronic neck pain, chronic right shoulder pain, and chronic low back pain with right sciatica.  *Id.* at 660.  She opined

that Gonzalez had moderate limitations in sitting, standing, squatting, bending, lifting, and carrying; mild limitations in walking; moderate limitations in reaching with her right shoulder, as well as pushing, pulling, lifting, and carrying with the right shoulder; and mild limitations to activities requiring frequent neck turns.  *Id.*

### xviii.  State Agency Consultants

Upon review of Gonzalez's medical file, two SSA disability examiners opined as to Gonzalez's impairments on October 8, 2015.  *Id*. at 412–17.  With respect to Gonzalez's physical impairments, R. Mausert, S.D.M., opined that Gonzalez could occasionally lift 10 pounds and frequently lift less than 10 pounds; stand and/or walk for a total of two hours; sit for about six hours in an eight-hour workday; and push and/or pull without limitations.  *Id.* at 412–13.  Mausert concluded that she could occasionally climb ramps or stairs, stoop, kneel, and crouch; frequently balance; never climb ladders, ropes, or scaffolds; and was limited in reaching overhead on the right side.  *Id.* at 413–14.

With respect to Gonzalez's mental impairments, state agency consultant H. Ferrin opined that she was moderately limited in her ability to maintain attention and concentration for extended periods, respond appropriately to changes in the work setting, and complete a normal workday or workweek without interruptions from psychologically-based symptoms.  *Id.* at 415–16.  Ferrin opined that there was no other evidence of limitations related to mental impairments.  *Id.* at 415–17.

### c. Adult Function Report

Gonzalez's daughter assisted her with completing an adult function report on August 10, 2015. *Id.* at 552–61. In the report, Gonzalez explained that she cares for her 12-year-old son with the help of her mother, cannot perform daily tasks such as lifting, walking, and cleaning, and can "no longer sleep through the night due to pain and stress about [her] condition." *Id.* at 553. She explained that she can prepare simple foods, but her mother helps her with most of her cooking and the housework. *Id.* at 554–55. Although Gonzalez wrote that she is able to go food shopping approximately once every two weeks, she is unable to go out alone. *Id.* at 555. She can pay her bills and handle her finances, but her social life has become limited as she "can no longer enjoy family gatherings since [her] pain is constant and [she] cannot sit for long." *Id.* at 556–57. She reported that she has no problems paying attention, finishing tasks and following spoken and written instructions. *Id.* at 558–59. Gonzalez described her pain as a "constant pulsing ache" in her lower back and spine which "radiates to [her] shoulders[,] neck, right arm and thighs," and worsens while sitting or standing for too long or from stress. *Id.* at 560.

## 3. Hearing Before the ALJ

Represented by counsel, Gonzalez appeared before ALJ Singh in White Plains by video hearing on August 28, 2017. *Id.* at 374–404. A vocational expert, Christine Ditrinco, and a Spanish language interpreter were also present. *Id.* at 374, 376. Gonzalez's counsel delivered an opening statement, in which she argued that Dr. Schwartz and Gonzalez's treating psychologist had both opined that

Gonzalez "has been unable to sustain any type of substantial gainful activity, even unskilled, sedentary work," and claimed that Dr. Schwartz's opinion was supported by diagnostic tests and should be accorded the most weight. *Id.* at 379. She also argued that, although Dr. Schwartz's opinion indicated that Gonzalez could do a range of sedentary work, her "additional mental limitations would erode that occupational base." *Id.*

Gonzalez testified that she last worked in October 2014, with the exception of December 2014, when she returned to work for three days before stopping due to pain. *Id.* at 380. She explained that she experiences pain in her back, neck, and right shoulder, and numbness in her right leg, and is only able to walk for about five minutes and stand and sit for five to ten minutes before her pain causes her to stop. *Id.* at 380–81. Gonzalez is right-handed, but testified that she is only able to lift about half a cup of coffee with her right hand, experiences difficulties writing, and requires assistance from her mother with buttoning her clothes. *Id.* at 381–82. Given that her most comfortable position is lying down in bed, Gonzalez described that she stays in bed from about 7:00 p.m. or 8:00 p.m. at night until 2:00 p.m. or 3:00 p.m. the next day. *Id.* at 383. Although she shops sometimes, her son assists her and her daughter buys heavier items online. *Id.* at 386. Gonzalez testified that she can drive short distances about four times per week to her doctors' offices. *Id.* at 392. She explained that she did not believe that she could perform a job that required her to sit down all day for five days a week because of the pain and

swelling in her back and neck; she "can't move" the same way a normal person can. *Id.* at 387.

On the subject of her mental health, Gonzalez testified that she began seeing a psychologist because she had lost motivation to leave her room or do anything, including talking to her children or mother, and she began hearing voices. *Id.* at 384. She described an inability to focus, and that she has difficulties with her short-term memory and concentration, and with following directions. *Id.* at 384–85. For example, Gonzalez said that she cannot focus on a half-hour long television show and sometimes forgets to take her medications. *Id.* at 385. She also does not read or watch movies because she cannot concentrate. *Id.* at 391–92.

Gonzalez reported that she had recently gained 25–30 pounds and believed her weight gain was due to the fact that she does not leave her room. *Id.* at 387–88. She has trouble climbing the two to three stairs it takes to enter her home. *Id.* at 388. She was wearing a prescription cervical collar, neck brace, and back brace, and testified that she wears these devices every day. *Id.* at 388–89. Gonzalez also stated that she takes pain medications every night to help her sleep, although she still wakes up at 2:00 a.m. or 3:00 a.m. on occasion. *Id.* at 390–91. She described that she receives counseling for her depression from psychiatrist Dr. Newton and psychologist Dr. Koretsky, which helps "a little bit." *Id.* at 391.

Following Gonzalez's testimony, the ALJ sought testimony from vocational expert Christine Ditrinco. *Id.* at 396–400. Ditrinco classified Gonzalez's past work as a cleaner and housekeeper as "unskilled, light" work. *Id.* at 396. The ALJ asked

Ditrinco about employment for a hypothetical person of Gonzalez's age, education, and work experience, who:

> can lift and carry 20 pounds occasionally, ten pounds frequently, stand and walk four hours, and sit[] for up to six hours during an eight hour work day.  Can never climb ladders, ropes and scaffolds, occasionally climb ramps, stairs, balance, stop, kneel, crouch and crawl, is limited to fine gross hand manipulations with the right hand, with the right hand frequently, with no overhead reaching with the right upper extremity, is to avoid hazards, such as moving machinery, and is further limited to understanding, remembering and carrying out simple and routine and repetitive, non complex tasks.

*Id.*  The ALJ clarified that the standing limitation "implie[d] . . . a sit/stand option" in which the hypothetical person would need to "stand up at the work station for every hour about two to three minutes and sit back down at the work station."  *Id.* at 397.  Ditrinco opined that the person could perform work at a light residual functional capacity ("RFC"), such as garment sorter, photocopy machine operator, or cashier at a parking lot.  *Id.* at 396–98.

The ALJ then asked Ditrinco whether an individual with the same age, education and past work experience as Gonzalez, but who could lift and carry ten pounds occasionally and less than ten pounds frequently, stand and walk for two hours, and sit for up to six hours (with a sit/stand option every hour) could perform jobs in the national economy.  *Id.* at 398.  The VE stated that such a person could perform sedentary work as an order clerk, document preparer, or final assembler.  *Id.* at 399.  If the person in either hypothetical situation would be off-task for 15 percent of the work day, however, Ditrinco opined that the individual would not be able to perform any jobs in the national economy.  *Id.* at 398–99.

Gonzalez's attorney then asked Ditrinco whether the individual in the sedentary hypothetical could perform work if the sit/stand option entailed alternating between the two positions every 15–30 minutes, and Ditrinco opined that such a limitation would not affect the jobs cited. *Id.* at 400–01. Furthermore, if the sedentary hypothetical individual could only occasionally interact with the public, supervisors and coworkers, the positions of document preparer or final assembler would remain available. *Id.* at 401. If the sedentary hypothetical individual could only occasionally reach or push and pull with the right dominant upper extremity, she would not be able to perform any of the jobs. *Id.* at 401–02. Finally, although Ditrinco opined that the same jobs would be available if the hypothetical sedentary individual could frequently, but not constantly, follow simple instructions, if such an individual could only occasionally follow simple instructions the positions would "probably not" be available. *Id.* at 402.

## II.  DISCUSSION

### A. Legal Standards

#### 1.  Judicial Review of Commissioner's Determinations

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g).

In certain circumstances, the court may remand a case solely for the calculation of benefits, rather than for further administrative proceedings.  "In . . . situations[ ] where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, [the court has] opted simply to remand for a calculation of benefits."  *Michaels v. Colvin*, 621 F. App'x 35, 38–39 (2d Cir. 2015) (summary order) (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)) (internal quotation marks omitted).  The court may remand solely for the calculation of benefits when "the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless."  *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence."  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

### 2.  Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  Physical

or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'"  *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a.  Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4).  First, the Commissioner must establish whether the claimant is presently employed.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe" impairment restricting her ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).  If the

claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *Id.*; 20 C.F.R. § 404.1520(d).  If not, the Commissioner continues to the fourth step and determines whether the claimant has the RFC to perform her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy.  *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.  Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted).  As part of this duty, the ALJ must "investigate the facts and

develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)). This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)). The ALJ must develop the record even where the claimant has legal counsel. *See*, *e.g.*, *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand is appropriate where this duty is not discharged. *See*, *e.g.*, *Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported

by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted).[12]  A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).  The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502.  Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the

---

[12] Revisions to the regulations in 2017 included modifying 20 C.F.R. § 404.1527 to clarify and add definitions for how to evaluate opinion evidence for claims filed before March 27, 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).  Accordingly, this Opinion and Order applies the regulations that were in effect when Gonzalez's claims were filed with the added clarifications provided in the 2017 revisions.

medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).

A treating physician's opinion is not always controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician

if clinical findings are inadequate).  As a result, "the 'treating physician rule' is

inextricably linked to a broader duty to develop the record.  Proper application of

the rule ensures that the claimant's record is comprehensive, including all relevant

treating physician diagnoses and opinions, and requires the ALJ to explain clearly

how these opinions relate to the final determination."  *Lacava v. Astrue*, No. 11-CV-

7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this

Circuit, the [treating physician] rule is robust."), *adopted by* 2012 WL 6621722 (Dec.

19, 2012).

To determine how much weight a treating physician's opinion should carry,

the ALJ must consider the so-called "*Burgess* factors" outlined by the Second

Circuit:

> (i) the frequency of examination and the length, nature
> and extent of the treatment relationship; (ii) the evidence
> in support of the treating physician's opinion; (iii) the
> consistency of the opinion with the record as a whole; (iv)
> whether the opinion is from a specialist; and (v) other
> factors brought to the Social Security Administration's
> attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see also Burgess,* 537 F.3d at

129; 20 C.F.R. § 404.1527(c)(2).  This determination is a two-step process.  "First,

the ALJ must decide whether the opinion is entitled to controlling weight."

*Estrella*, 925 F.3d at 95.  Second, if, based on these considerations, the ALJ declines

to give controlling weight to the treating physician's opinion, the ALJ must

nonetheless "comprehensively set forth reasons for the weight" ultimately assigned

to the treating source.  *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133

(responsibility of determining weight to be afforded does not "exempt administrative

decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)).  If the ALJ decides the opinion is not entitled to controlling weight, "[a]n ALJ's failure to 'explicitly' apply these '*Burgess* factors' when [ultimately] assigning weight at step two is a procedural error."  *Estrella*, 925 F.3d at 96 (quoting *Selian*, 708 F.3d at 419–20).  The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician.  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted).  Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons."  *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

### d.  Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court.  *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006).  "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints."  *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).  Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–

61 (2d Cir. 1988)).  "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'"  *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)).  Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations.  *Id.*  First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)).  "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record."  *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7.

> [a]ny other factors concerning the individual's functional
> limitations and restrictions due to pain or other
> symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

## B. The ALJ's Decision

In a decision dated December 27, 2017, the ALJ concluded that Gonzalez was not disabled as defined by the Social Security Act. AR at 30–41. Following the five-step inquiry, the ALJ first found that Gonzalez had not engaged in substantial gainful activity since the alleged onset date of December 7, 2014. *Id.* at 32. At the second step, the ALJ found that Gonzalez had severe impairments of work-related neck and back injury and "depression—secondary to physical ailments." *Id.*

At step three, the ALJ concluded that Gonzalez did not have an impairment or combination thereof that met or medically equaled the severity of one of the listed impairments. *Id.* With respect to her physical impairments, the ALJ considered Listings 1.02 and 1.04 (Musculoskeletal System) but determined that Gonzalez did not meet the criteria because she was able to ambulate effectively and did not have motor, reflex, or sensory loss. *Id.* at 33. In considering her mental impairment under Listing 12.04 (Depressive, bipolar, and related disorders), the ALJ drew from Dr. Antiaris's mental status examination and Gonzalez's subjective allegations to find that neither the paragraph B nor C criteria were satisfied. *Id.* at 33–34. As to paragraph B criteria, which require that the claimant has at least one extreme or two marked limitations in broad areas of functioning, the ALJ found

40

that Gonzalez had only moderate limitations in understanding, remembering, or applying information and concentrating, persisting, or maintaining pace; a mild limitation in interacting with others; and no limitation or adapting or managing oneself. *Id.* Under the paragraph C criteria, the ALJ found that, although Gonzalez's mental impairments have persisted for more than two years and she was receiving treatment in the form of outpatient therapy, the evidence failed to show that Gonzalez achieved only marginal adjustment, as she cared for herself and her children "without mental interference." *Id.* at 34.

At step four, the ALJ concluded that Gonzalez has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) except that she can lift 20 pounds occasionally, 10 pounds frequently, and sit for six hours, with standing/walking limited to four hours in an eight-hour workday (including a sit/stand option that would allow Gonzalez to sit at the work station for every hour for two to three minutes). *Id.* She further determined that Gonzalez can do all postural maneuvers occasionally, but can never climb ladders, ropes, or scaffolds, and is limited to frequent fine gross manipulations with the right hand, but no overhead reaching with the right upper extremity. *Id.* Finally, Gonzalez must avoid hazards and heavy machinery, and is limited to understanding, remembering, and carrying out simple routine non-complex tasks. *Id.*

In reaching this RFC determination, the ALJ reviewed Gonzalez's treatment history and medical imaging evidence and weighed the opinions of consultative examiners. *Id.* at 34–40. With respect to her physical impairments, the ALJ

considered MRIs of Gonzalez's lumbar and cervical spine, an EMG report, her subjective reports of pain, and objective examinations. *Id.* at 35–36.  In connection with Gonzalez's depression, the ALJ noted that Dr. Koretsky did not complete a mental status examination and gave little weight to his opinion, which she found to "rel[y] heavily on [Gonzalez's] subjective allegations." *Id.* at 36.  In contrast, the ALJ considered her RFC determination to be consistent with Dr. Miskin's mental status examination, which revealed appropriate affect, mildly dysphoric mood, clear sensorium, intact memory, intact abstraction ability, good judgment[] and good insight." *Id.*  She gave Dr. Miskin's opinion great weight. *Id.*

The ALJ accorded some weight to Dr. Ganal's opinion that Gonzalez has a mild orthopedic disability, Dr. Kayal's opinion that Gonzalez may return to "light duty" work, and Dr. Kim's opinion that Gonzalez has no chiropractic disability, as she found them to be consistent with the RFC, yet unaccompanied by a function-by-function analysis of Gonzalez's residual abilities. *Id.*

The opinions of Drs. Pflum, Schwartz, Radna, Nieves, and Barry that Gonzalez has a 75 percent to 100 percent temporary disability received little weight, as the ALJ found those numbers to be "ambiguous without an adequate specific function-by-function analysis of [Gonzalez's] abilities," and there is a possibility that their findings of "temporary total disability" did not consider a reduced range of light work, which the ALJ outlined in the RFC determination. *Id.* at 37.  Little weight was also given to Dr. Kayal's opinion that Gonzalez "should be excluded from work" because conclusions finding her "disabled" and "unable to work" are

reserved to the Commissioner (20 C.F.R. § 404.1527(d)) and in any event the ALJ found them to be inconsistent with the record as a whole. *Id.* Similarly, the unidentified chiropractor's opinion that Gonzalez is completely restricted from lifting and 100 percent temporarily impaired was given little weight, as the ALJ found it to be unsupported by the record. *Id.* Moreover, the chiropractor's opinion did not include any sitting or standing limitation, which the ALJ found to "decreas[e] its consistency" with the record. *Id.*

The ALJ assigned some weight to Dr. Nieves' opinion that Gonzalez is unable to perform past work activities without certain restrictions and Dr. Schwartz's opinion that Gonzalez is limited to light duty, sedentary work with additional limitations related to lifting, sitting and standing, taking breaks, postural maneuvers, and exposures to environmental hazards. *Id.* Although the ALJ observed that the opinions raised specific areas of exertional and non-exertional limitations, they "failed to provide details regarding specific total time allocations for exertional activities." *Id.*

Certain functional limitations supported by the opinions of Drs. Antiaris and Kaci were incorporated in the ALJ's RFC. *Id.* at 37–38. For example, some weight was given to Dr. Antiaris' opinion that Gonzalez has no limitations or mild limitations in all areas of mental functioning because the ALJ found the opinion to be properly based on medical evidence in the record, although there was some evidence of "deeper limitation in [Gonzalez's] brief medical record." *Id.* at 38. Some weight was also given to Dr. Kaci's opinion that Gonzalez is moderately limited in

her ability to sit, stand, squat, bend, lift, and carry, as well as reach, push, and pull with the right shoulder.  *Id.*

The ALJ gave little weight to Dr. Koretsky's August 3, 2017 opinion that Gonzalez is extremely limited in her ability to make simple work-related decisions and markedly limited in her ability to interact appropriately with the public, supervisors, and co-workers, as the ALJ found it to be inconsistent with other psychiatric opinions and objective mental status examinations by Drs. Antiaris and Miskin.  *Id.*  The state agency consultant's opinion was given little weight, as it was produced prior to the inclusion of additional evidence in the record and did not consider Gonzalez's subjective complaints.  *Id.*  Finally, the third-party function report was given little weight because it is a lay opinion, based on casual observation, and therefore does not outweigh the objective medical evidence in the record.  *Id.* at 38–39.

In considering Gonzalez's symptoms under the factors described in 20 C.F.R. § 404.1529(c)(3), the ALJ found that her allegations about the intensity, persistence, and limiting effects of the symptoms were not consistent with the medical evidence in the record.  *Id.* at 39.  In particular, the ALJ concluded that Gonzalez can take care of daily needs around the house, with some help due to pain; her medication was "essentially routine"; the chiropractor observed that Gonzalez gave "poor effort" in her evaluation; and the record does not contain any non-conclusory opinions from a treating or examining physician that Gonzalez is disabled.  *Id.*  After determining her residual functional capacity, the ALJ found that Gonzalez is unable to perform

any past relevant work, citing the vocational expert's testimony that her past relevant work as a cleaner, which is unskilled work at light exertion, exceeds the RFC.  *Id.* at 39–40.

Lastly, relying on the vocational expert's testimony, the ALJ found that, considering Gonzalez's education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that she could perform, specifically a garment sorter, photocopy machine operator, and parking lot cashier. *Id.* at 40–41.  Therefore, the ALJ concluded that Gonzalez was not disabled within the meaning of the Social Security Act and denied her claim.  *Id.* at 41.

## C. Analysis

Gonzalez argues that the ALJ committed several errors in her disability determination.  According to Gonzalez, the ALJ erred by finding that her impairments did not meet or equal Listings 12.04A and 1.04A (Pl. Mem. at 17–19); failing to accord proper weight under the treating physician rule to the opinions of Drs. Schwartz and Koretsky (*id.* at 20–26); failing to consider that Gonzalez's persistent efforts to obtain relief of symptoms enhanced her credibility (*id.* at 26–27); and failing to develop the record (*id.* at 27–28).  The Commissioner disagrees and has responded to each of these claims in his cross-motion.  Def. Mem. at 17–30. As discussed below, substantial evidence supports the ALJ's finding that Gonzalez's impairments did not meet or equal a Listing.  Additionally, although the ALJ did violate the treating physician rule as to Drs. Schwartz and Koretsky, such error was

harmless.  Finally, the ALJ did not err in assessing Gonzalez's credibility or in developing the record.

## 1.   The ALJ Did Not Err in Evaluating Gonzalez's Impairments Under the Medical Listings

In the third step of the five-step test, the ALJ is required to determine whether Gonzalez had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995).  "The applicant bears the burden of proof [at this stage] of the sequential inquiry[.]"  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (alterations omitted).  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

In determining whether the plaintiff meets or equals one of the Listings at step three, the ALJ must set forth a "specific rationale" in support of the conclusion. *McHugh v. Astrue*, No. 11-CV-578 (MAT), 2013 WL 4015093, at *6–7 (W.D.N.Y. Aug. 6, 2013) (citing *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982)).  This legal standard requires that the decision contain more than a brief, conclusory statement that the plaintiff fails to meet any of the Listings.  *Id*. at *6.  However, the failure to provide a "specific rationale" is not necessarily fatal if the "ALJ's

disability determination can be 'reasonably inferred' based on 'substantial evidence' contained elsewhere in the opinion." *Id*. at *7 (quoting *Berry*, 675 F.2d at 468–69).

Gonzalez contends that the ALJ erred in finding she did not satisfy Listings 12.04A and 1.04A.  Pl. Mem. at 17–19.  The Court concludes that the ALJ's determination at step three was supported by substantial evidence.

### a.  Listing 12.04

Gonzalez argues that remand for the "proper evaluation of medical records" is warranted because "substantial evidence [exists] to support the assertion that [she] meets listing 12.04A [depressive, bipolar, and related disorders]."  Pl. Mem. at 18.  As a threshold matter, however, even if Gonzalez meets paragraph A of Listing 12.04, such a determination is not dispositive of whether her impairment meets or equals the severity of Listing 12.04, because she must also meet the requirements of either paragraph B or paragraph C in order to satisfy the criteria of Listing 12.04. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04.  Therefore, if an ALJ properly determines that a claimant has not met the criteria of paragraphs B or C, the ALJ need not explicitly address the criteria of paragraph A, and satisfaction of paragraph A may be assumed.  *See, e.g., Mitchell v. Berryhill,* No. 16-CV-6588 (WHP) (HBP), 2018 WL 3300683, at *16 (S.D.N.Y. Feb. 2, 2018) (satisfaction of paragraph A assumed where ALJ found plaintiff failed to satisfy both paragraph B and paragraph C criteria), *adopted sub nom. Mitchell v. Colvin,* 2018 WL 1568972 (Mar. 30, 2018); *Cienfuegos v. Comm'r of Soc. Sec.*, 13-CV-6968 (LTS) (HBP), 2015 WL 256134 at *14 (S.D.N.Y. Jan. 21, 2015) (reviewing court may assume ALJ

concluded claimant met paragraph A criteria where criteria not expressly addressed, and ALJ considered only paragraphs B and C).  Accordingly, the Court will assume that the ALJ found that Gonzalez met the medical documentation requirements of paragraph A and focus its analysis on paragraphs B and C.  20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04.

Assuming *arguendo* that Gonzalez intended to assert that she meets all of the criteria of Listing 12.04, that argument fails, as the ALJ relied on substantial evidence in concluding that her impairments did not meet the criteria for paragraphs B or C.  To meet the criteria of Paragraph B, a plaintiff must demonstrate extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; or (4) adapt or manage oneself.  20 C.F.R., Pt. 404, Subpt. P., App'x 1, § 12.06(b).  Paragraph C requires that a plaintiff demonstrate that her mental disorder is "serious and persistent," meaning there is a medically documented history of the disorder for a period lasting longer than two years.  20 C.F.R., Pt. 404, Subpt. P., App'x 1, § 12.06(c).  Additionally, the plaintiff must provide evidence of (1) medical treatment or mental health therapy that diminishes signs or symptoms of the mental disorder; and (2) marginal adjustment, meaning the plaintiff has the minimum capacity to adapt to changes in the environment or to demands not already included in the

plaintiff's daily life.  *Id.*[13]  Limitations in an area of functioning are considered "marked" when the ability to function independently, appropriately, and effectively on a sustained basis is seriously limited, 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(F)(2)(d), and are considered "extreme" when there is no ability to function independently, appropriately, and effectively on a sustained basis.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(F)(2)(e).

With respect to understanding, remembering, or applying information, the record supports the ALJ's conclusion that Gonzalez is only moderately limited on the basis of her subjective allegations and Dr. Antiaris's mental status examination, which "revealed . . . only mildly impaired memory with the ability to recall three of three objects immediately and two with delay."  AR at 33 (citing *id.* at 654).  The ALJ additionally relied on Gonzalez's ability to recall six digits forward and three back.  *Id.*  Similarly, Dr. Koretsky opined that Gonzalez has a moderate limitation in her ability to understand, remember, and carry out simple instructions, *id.* at 972, and no other physician determined that Gonzalez has a more severe limitation in this area of functioning.  Indeed, Dr. Antiaris opined that there were "no

---

[13] The criteria used to evaluate mental disorders under Listings 12.04 and 12.06 were revised effective January 17, 2017, and are therefore applicable to Gonzalez's claim, which was decided by the ALJ on December 27, 2017.  *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed Reg. 66138-01, 2016 WL 5341732, at *66138 (Sept. 26, 2016).  "That rule notes: 'We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.'"  *Andrews v. Comm'r of Soc. Sec.*, No. 16-CV-6867 (KMK) (JCM), 2017 WL 6398716, at *10 n.4 (S.D.N.Y. Oct. 24, 2017) (quoting *id.* at *66139 n.1), *adopted by* 2017 WL 6398727 (Dec. 13, 2017).

limitations in [Gonzalez's] ability to follow and understand simple directions and instructions and perform simple tasks independently." *Id*. at 654.

The ALJ's conclusion that Gonzalez has only a mild limitation in her ability to interact with others is also supported by substantial evidence. The ALJ based this determination on Gonzalez's subjective allegations of social withdrawal, balanced against her "adequate social relationship[s] with family and friends," and lack of any evidence that she is limited in her "ability to adhere to social norms or to display acceptable social behavior." *Id*. at 33 (citing *id*. at 655). Indeed, while Dr. Koretsky's treatment notes indicate withdrawal due to anxiety and depression, Gonzalez never demonstrated an inability to interact with others, and appears to have healthy relationships with family members. *Id*. at 557, 651, 688, 738. Evidence from multiple physicians demonstrates that Gonzalez was "cooperative" in her examinations, and Dr. Antiaris found that, while Gonzalez was "not social with many friends," she was not limited in her abilities to "make appropriate decisions or relate adequately with others." *Id*. at 654–55, 782.

As to the ability to concentrate, persist, or maintain pace, the ALJ did not err in determining that Gonzalez is moderately limited, in light of Gonzalez's subjective allegations and Dr. Antiaris's examination. *Id*. at 33 (citing *id*. at 654). Gonzalez testified that she does not read because she cannot concentrate, and Dr. Koretsky opined that Gonzalez was "unable to concentrate." *Id*. at 391–92. However, Dr. Antiaris's mental status examination revealed only mildly impaired concentration, as Gonzalez was able to count serial threes correctly, but had some difficulty with

simple calculations.  *Id.* at 654.  It is well settled that where there are conflicts in the medical evidence, "it is the ALJ's decision that controls as factfinder."  *King v. Astrue*, 32 F. Supp. 3d 210, 220 (N.D.N.Y. 2012) (citing *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)); *see also Scully v. Berryhill*, 282 F. Supp. 3d 628, 636 (S.D.N.Y. 2017) (ALJ's decision upheld where medical evidence could support either finding that claimant's impairments did or did not medically equal listing).  Moreover, even if her ability to concentrate or maintain pace could arguably be considered a "marked limitation" as opposed to a "moderate limitation," a plaintiff must demonstrate a marked limitation in *two* areas of functioning to meet the paragraph B criteria, and Gonzalez has not demonstrated that she is markedly limited in any other area.  *See* 20 C.F.R., Pt. 404, Subpt. P., App'x 1, § 12.06(b).

Finally, in considering Gonzalez's ability to manage herself, the ALJ relied on substantial evidence in finding no limitation, as she cares for her daily needs, manages a schedule, and parents her children "without psychiatric interference." *Id.* at 33.  Dr. Antiaris also opined that Gonzalez's adaptive functioning was "unremarkable."  *Id.* (citing *id.* at 654).  Although the ALJ observed that Gonzalez relies upon her mother for help with household chores, *see id.* at 33, her difficulties in managing her household appear to be the result of limitations caused by her physical impairments, and the record does not suggest that her mental impairments limit her ability to manage herself.

With respect to the requirements of paragraph C, the ALJ recognized that Gonzalez's mental impairments have persisted for more than two years.  *Id.* at 34.

Although Gonzalez receives outpatient therapy treatment, the ALJ found that the record "fails to show that [she] has achieved only marginal adjustment as she takes care of herself and her children without mental interference." *Id*. "Marginal adjustment" is defined as "minimal capacity to change in [one's] environment or to demands that are not already part of [one's] daily life." 20 C.F.R. pt. 404, Subpt. P, App'x 1, § 12.02(C)(2). This generally requires a showing that "adaptation to the requirements of daily life is fragile," such that any changes in environment have led to a "deterioration in . . . functioning," an inability to function outside the home or "a significant change in medication or other treatment." *Id*. § 12.00(G)(2)(c). The record does not suggest that Gonzalez experienced only marginal adjustment, as she is able to manage herself and her household with the help of her family. Moreover, while her depression and anxiety persisted throughout 2017, the period of "worsening" described by Dr. Koretsky corresponds with Gonzalez's inability to fulfill her depression medication prescription. *Id*. at 1074. Gonzalez otherwise remained generally stable and had no record of psychiatric hospitalization. The ALJ therefore did not err in determining that Gonzalez did not meet the requirements of Paragraph C, and substantial evidence supports the ALJ's decision that Gonzalez's impairments did not meet or medically equal Listing 12.04.

### b. Listing 1.04A

Gonzalez also argues that the ALJ erred in concluding that her cervical and lumbosacral spine impairments do not meet the criteria for Listing 1.04A. Pl. Mem.

52

at 18–19 (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, at § 1.04).  To meet or

equal the severity of Listing 1.04A, the claimant must suffer from:

> Disorders of the spine (e.g., herniated nucleus pulposus,
> spinal arachnoiditis, spinal stenosis, osteoarthritis,
> degenerative disc disease, facet arthritis, vertebral
> fracture), resulting in compromise of a nerve root
> (including the cauda equina), or the spinal cord.  With:
>
> A. Evidence of nerve root compression characterized by
> neuroanatomic distribution of pain, limitation of motion of
> the spine, motor loss (atrophy with associated muscle
> weakness or muscle weakness) accompanied by sensory or
> reflex loss and, if there is involvement of the lower back,
> positive straight-leg raising test (sitting and supine) . . . .

20 C.F.R., Part 404, Subpt. P, App'x 1, § 1.04.

Here, the ALJ offered only a cursory analysis under Listing 1.04: "I have

considered the listings generally under, *1.02 and 1.04 Musculoskeletal System* and

specifically, the medical records indicate that the claimant retains the ability to

ambulate effectively nor does she possess motor loss, reflex loss or sensory loss."  AR

at 33.  Despite the lack of a detailed explanation given by the ALJ, substantial

evidence supports the conclusion that Gonzalez did not meet Listing 1.04A.

In support of her argument, Gonzalez referred to Dr. Schwartz's November

18, 2016 and April 1, 2017 cervical spine evaluations, which revealed "cervical

derangement with myofasciitis with probable underlying radiculopathy with

posterior disk herniation at C4-5, C5-6, and C6-7, which contacts the cervical cord"

and "cervical nerve root irritation."  Pl. Mem. at 18–19 (citing AR at 920).  Dr.

Schwartz also observed Gonzalez's muscle grade strength to be a 4+/5 in the cervical

paraspinals; pain in the cervical/lumbar paraspinals; and limited cervical and

lumbar range of motion.  Pl. Mem. at 19 (citing AR at 917, 919–20).  As the

Commissioner noted, however, the ALJ properly based her determination on

contemporaneous findings in the record from Drs. Pflum, Neustadt, and Kim that

Gonzalez had a "fair range of motion in [her] cervical spine, symmetrical deep

tendon reflexes, and symmetrical motor function," Def. Mem. at 20 (citing AR at 35,

883), "no objective evidence of any significant neurological dysfunction," *id.* (citing

AR at 864), "normal muscle strength in all major muscle groups . . . and no evidence

of muscle atrophy," *id.* (citing AR at 792), and "no tenderness to palpation [of the

cervical and lumbar spines] and negative straight leg raising tests," *id.*

Moreover, although there are several examples of positive straight leg raising

tests in the record, *see, e.g.,* AR at 659, 920, 962, the ALJ's failure to explicitly

consider these does not change the determination under Listing 1.04A because

Gonzalez has not established that she suffered from motor loss, a necessary

component of this Listing.  *See, e.g., Knight v. Astrue*, 32 F. Supp. 3d 210, 219

(N.D.N.Y. 2012) (evidence of nerve compression and positive straight-leg-raising

tests did not satisfy Listing 1.04A where no evidence of motor loss and sensory or

reflex loss).  Gonzalez does not offer, and the Court cannot identify, any evidence in

the record that suggests motor loss.  Moreover, even if some evidence in the record

suggested motor loss, three separate physicians who examined Gonzalez in 2016

and 2017 found symmetrical motor functioning, normal neurological functioning,

and lack of any evidence of muscle atrophy.  Def. Mem. at 20 (citing AR at 792, 864,

883).  "Genuine conflicts in the medical evidence are for the Commissioner to

resolve." *Jones v. Berryhill*, 415 F. Supp. 3d 401, 414 (S.D.N.Y. 2019) (quoting

*Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir. 2002)).  "Where the Commissioner's

decision rests on adequate findings supported by evidence having rational probative

force, [the Court] will not substitute [its] judgment for that of the Commissioner."

*Veino*, 312 F.3d at 588.  Thus, substantial evidence that Gonzalez did not suffer

from any motor loss supports the ALJ's determination that her impairments did not

meet or medically equal Listing 1.04A.

### 2.  The ALJ's Violations of the Treating Physician Rule Were Harmless

#### a.  Dr. Schwartz

In reaching a determination as to Gonzalez's physical RFC, the ALJ gave

little weight to Dr. Schwartz's opinion that Gonzalez has a 75 to 100 percent

temporary disability and some weight to Dr. Schwartz's opinion that Gonzalez is

limited to full-time light duty capacity, sedentary work, with lifting up to 10 pounds

occasionally; sitting and standing 15 to 30 minutes; allowing frequent breaks as

needed with walking five to ten minutes and only occasional postural maneuvers.

AR at 37 (citing *id.* at 920, 924).  Gonzalez argues that the ALJ should have

accorded Dr. Schwartz's opinions "great, if not controlling, weight" because he is a

treating physician whose opinions are consistent with objective diagnostic evidence,

objective clinical examinations by other physicians, and the opinions of Drs. Kayal,

Ganal, and Nieves.  Pl. Mem. at 20–23.  Gonzalez further contends that, having

given Dr. Schwartz less than controlling weight, the ALJ erred in failing to conduct

an analysis of the weight given according to 20 C.F.R. §§ 416.927(c)(1)–(5).  Pl.

Mem. at 23–24.  The Commissioner responds that Dr. Schwartz was not considered a treating source under the regulations at the time he offered his opinion (November 18, 2016) because the opinion was rendered on the same date as his initial evaluation of Gonzalez.  Def. Mem. at 21 (citing AR at 919–20).  Moreover, although Dr. Schwartz restated his opinions in subsequent treatment notes, he only appears to have examined Gonzalez three times: November 2016, February 2017, and April 2017.  *Id.* (citing AR at 919–20, 923–24, 927–43).

According to the applicable regulations, a treating source is an "acceptable medical source who provides [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R.  § 404.1527(a)(2).  Generally, a physician who has examined a claimant on only one or two occasions is not considered a treating physician.  *See id.*  However, there is no minimum number of visits or period of treatment by a physician before this standard is met.  *Id.* (ongoing treatment relationship can be established by medical source "who has treated or evaluated [the claimant] only a few times . . . if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)").  "[C]ourts have held that SSA adjudicators should focus on the nature of the ongoing physician-treatment relationship, rather than its length."  *Vasquez v. Colvin*, No. 14-CV-7194 (JLC), 2015 WL 4399685, at *20 (S.D.N.Y. July 20, 2015) (internal alteration and quotation marks omitted) (citing *Schisler v. Bowen*, 851 F.2d 43, 45 (2d Cir. 1988)) (upholding draft Social Security Ruling clarifying that treating physician's "ongoing" relationship with claimant may

be "of a short time span"); *see also Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55

(2d Cir. 1992) ("The nature–not the length–of the [physician-patient] relationship is

controlling."); *Vargas v. Sullivan*, 898 F.2d 293, 294 (2d Cir. 1990) (applying

treating physician rule where doctor saw patient for only three months).

Based on the evidence in the record, the ALJ should have considered Dr.

Schwartz to be a treating physician.  Dr. Schwartz conducted physical examinations

of Gonzalez on at least three occasions between November 2016 and April 2017.  AR

at 919–20, 923–24, 927–43.  At her February 4, 2017 follow-up evaluation, Dr.

Schwartz also made referrals to a spinal surgeon and pain management specialist.

*Id.* at 924.  In addition, on April 1, 2017, Dr. Schwartz performed EMG and nerve

conduction studies, which revealed right C4, L4, and L5 radiculopathy with

denervation.  *Id.* at 927–35, 40.  Other decisions have inferred a treating

relationship in similar circumstances.  In *Nunez v. Berryhill*, for example, a

physician who met with the claimant three times in the course of three months was

considered a treating source.  *Nunez v. Berryhill*, No. 16-CV-5078 (HBP), 2017 WL

3495213, at *23 (S.D.N.Y. Aug. 11, 2017).  In that case, the doctor "wrote an EMG

report[,]" "referred plaintiff for the EMG[,]" "noted plaintiff's medical history and

the results of the EMG and a physical examination[,]" "diagnosed plaintiff[,]" and

"prescribed medication[.]"  *Id.*  In *Vasquez v. Colvin*, a doctor who met with the

claimant four times was considered a treating physician where he "referred [the

claimant] to other specialists for further treatment and testing[,]" "wrote a brief

note confirming [claimant's] impairments[,]" and was referred to by the claimant as his treating physician. *Vasquez*, 2015 WL 4399685, at *20.

"Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion." *Estrella*, 925 F.3d at 95. "First, the ALJ must decide whether the opinion is entitled to controlling weight." *Id*. The ALJ must give controlling weight to a treating physician's opinion if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id*. (citing *Burgess*, 537 F.3d at 128). If substantial evidence in the record contradicts or questions the credibility of a treating source's assessment, the ALJ may give that source's opinion less deference. *See Halloran*, 362 F.3d at 32.

Second, if an ALJ does not give controlling weight to a treating source's opinion, the ALJ must consider various factors and provide "good reasons" for the weight given. 20 C.F.R. § 404.1527(c)(2)–(6); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). These "nonexclusive '*Burgess* factors' [include]: '(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Estrella*, 925 F.3d at 95–96 (citing *Selian*, 708 F.3d at 418). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Id*. at 96. If the ALJ does not "explicitly" consider these factors,

the case must be remanded unless "a searching review of the record" assures the Court that the ALJ applied "the substance of the treating physician rule." *Id.*

Here, even though the ALJ failed to properly recognize Dr. Schwartz as a treating physician, she nevertheless provided "good reasons" for giving his opinion some—rather than controlling—weight.  20 C.F.R. § 404.1527(c)(2)–(6).  First, the ALJ did not explicitly consider the length and extent of Dr. Schwartz's treatment relationship with Gonzalez, but, as previously stated, the record does not include evidence that Dr. Schwartz treated her on more than three occasions.  Thus, while it is possible that Dr. Schwartz could have provided slightly more valuable insight than a consultative examiner, the short span of his treating relationship does not provide a "longitudinal treatment history" that merits deference.  *Suzanne M. v. Comm'r of Soc. Sec.*, No. 6:18-CV-485 (LEK), 2019 WL 4689227, at *5 (N.D.N.Y. Sept. 26, 2019) (ALJ properly discounted opinion of treating physician who had examined claimant three times in less than a year due, in part, to short treating history); *see also Hemmer v. Colvin*, No. 6:15-CV-06546 (MAT), 2016 WL 7425906, at *4 (W.D.N.Y. Dec. 22, 2016) (ALJ appropriately considered fact that treating physician treated claimant on only three occasions over span of two years in rejecting physician's opinion).

Second, the ALJ found that Dr. Schwartz's opinions as to Gonzalez's physical abilities were unsupported by his own treatment notes.  For example, Dr. Schwartz's own observations that Gonzalez had a normal gait, was able to dress and care for herself, and did not exhibit muscle atrophy in her upper or lower

extremities all support the ALJ's conclusion that Dr. Schwartz's opinions as to the percentage of her disability and limitations in postural maneuvers were only partially consistent with his treatment notes. *See* Def. Mem. at 22–23 (citing AR at 919–20).

Third, substantial evidence in the record contradicts Dr. Schwartz's opinions. The ALJ found the following facts to be inconsistent with the severe limitations on Gonzalez's functional capacity as articulated by Dr. Schwartz: an examination by Dr. Pflum showing fair range of motion in the cervical spine and symmetrical deep tendon reflexes and motor function, AR at 35 (citing *id.* at 883); Dr. Neustadt's examination and conclusion that there was no evidence of neurological dysfunction, *id.* at 36 (citing *id.* at 864); and Dr. Kim's January 2017 examination and subsequent findings of normal muscle strength in all major muscle groups, intact sensation, and lack of evidence of muscle atrophy, *id.* (citing *id.* at 792). "In reviewing the ALJ's decision, this Court does not re-weigh the evidence." *Martinez v. Comm'r of Soc. Sec.*, No. 18-CV-1570 (KHP), 2019 WL 3852439, at *10 (S.D.N.Y. Aug. 16, 2019) (citing *Jones*, 949 F.2d at 59 ("[T]he court may not substitute its own judgment for that of the [ALJ]."))  Where substantial evidence in the record supports "disparate findings," the Court must defer to the ALJ's factual determinations. *Quinones on Behalf of Quinones v. Chater*, 117 F.3d 29, 36 (2d Cir. 1997); *see also, e.g., Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

Accordingly, although Dr. Schwartz is Gonzalez's treating physician, the ALJ's decision to assign little weight to his opinion is based on substantial evidence.

To the extent the ALJ erred in failing to properly analyze Dr. Schwartz's opinions under the treating physician rule, the error was harmless, as the ALJ would have arrived at the same conclusion even if Dr. Schwartz had been recognized as a treating physician. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (declining to remand even though ALJ failed to satisfy treating physician rule where "application of the correct legal principle could lead [only to the same] conclusion"). As such, there is no merit to Gonzalez's argument that the ALJ's failure to abide by the treating physician rule with respect to Dr. Schwartz is an error warranting remand.

### b. Dr. Koretsky

With respect to her mental RFC, the ALJ concluded that Gonzalez was limited to understanding, remembering, and carrying out simple routine non-complex tasks. AR at 34. Gonzalez argues that the ALJ violated the treating physician rule as to Dr. Koretsky, who opined that she was markedly limited in her ability to remember and carry out simple instructions, and extremely limited in her ability to make judgments on simple and complex work-related decisions and carry out complex instructions. Pl. Mem. at 25. Gonzalez contends that Dr. Koretsky's opinion is entitled to controlling weight because it is consistent with substantial evidence in the record. *Id.* at 25–26.

Dr. Koretsky treated Gonzalez regularly from May 2015 until at least August 2017, and therefore qualifies as a treating physician. *Id.* at 630–43, 650–51, 683–91, 726–41, 890–95, 971–75, 1056–118. As such, the ALJ should have "explicitly"

addressed the *Burgess* factors in her decision to assign the opinion "little weight." *See Estrella,* 925 F.3d at 95.  While the Second Circuit "does not require 'slavish recitation of each and every factor,' the ALJ's 'reasoning and adherence to the regulation' still must be clear from his opinion." *Cabrera v. Comm'r of Soc. Sec.*, No. 16-CV-4311 (AT), 2017 WL 3686760, at *3 (S.D.N.Y. Aug. 25, 2017) (citing *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013)).

The ALJ gave Dr. Koretsky's opinion little weight because she found the doctor's observation that Gonzalez "hears voices, is depressed, unable to concentrate and possess[es] difficulty remembering and attending to task" to be "inconsistent with other psychiatric opinions in the record, including the objective mental status examinations of Dr. Antiaris and Dr. Miskin." AR at 38.  The ALJ also noted that Dr. Koretsky seemed "to heavily rely on [Gonzalez's] subjective allegations with[out] mention of any mental status examination," and found his opinion that Gonzalez was "totally disabled based on major depressive disorder or psychiatric comorbidities" to be "unfounded in the record as a whole." *Id.* at 36.  Although the ALJ committed procedural error by not explicitly discussing the *Burgess* factors, such error was harmless as an explicit consideration of these factors would not have led the ALJ to a different result as to the ultimate question of disability.

It is true that the ALJ should have considered the length and frequency of Dr. Koretsky's treatment of Gonzalez, which is "especially relevant in evaluating a claimant's psychiatric impairments," as well as Dr. Koretsky's specialty in psychology.  *See, e.g., Rodriguez v. Astrue*, No. 07-CV-534 (WHP) (MHD), 2009 WL

637154, at *26 (S.D.N.Y. Mar. 9, 2009).  Dr. Koretsky began treating Gonzalez in May 2015 and, by the time of his last opinion written in August 2017, he had authored more than two years of treatment notes.  AR at 630–33, 650–51, 681–91, 726–41, 890–95, 971–75, 1056–67, 1068–118.  As such, Dr. Koretsky was uniquely positioned to opine on Gonzalez's limitations.  *See, e.g., Santiago v. Barnhart*, 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006) ("The Treating Physician Rule recognizes that a physician who has a long history with a patient is better positioned to evaluate the patient's disability than a doctor who observes the patient once for the purposes of a disability hearing.").

Moreover, two of the ALJ's reasons proffered for discounting Dr. Koretsky's opinion are erroneous.  First, the ALJ "noted that Dr. Koretsky stated in his opinion form that Plaintiff heard voices, demonstrated psychotic features, and was unable to maintain concentration, but did not mention auditory hallucinations or concentration problems in his treatment notes."  Def. Mem. at 25.  But several of Dr. Koretsky's treatment notes over the course of one year (from January 2016 to January 2017), in addition to the treatment note from Dr. Newton on February 29, 2016, mention that Gonzalez heard voices.  AR at 727, 730, 735, 739, 845, 1066.  Second, the ALJ explicitly rejected Dr. Koretsky's opinion on the basis that it "seem[ed] to heavily rely on [Gonzalez's] subjective allegations[.]"  *Id.* at 36.  However, "it is not only appropriate [for a psychologist] to rely on subjective complaints, it is required in diagnosing mental impairments."  *Marcano v. Berryhill*, No. 13-CV-3648 (NSR)(LMS), 2017 WL 2571353, at *17 (S.D.N.Y. Mar. 29, 2017),

*adopted by* 2017 WL 2560926 (June 13, 2017) (citation omitted); *see also Santana v. Astrue,* No. 12-CV-0815 (BMC), 2013 WL 1232461, at *14 (E.D.N.Y. Mar. 26, 2013) ("It is axiomatic that a treating psychiatrist must consider a patient's subjective complaints in order to diagnose a mental disorder . . . [C]onsideration of a patient's report of complaints, or history, as an essential diagnostic tool, is a medically acceptable clinical and laboratory diagnostic technique.").

Notwithstanding these errors, the ALJ properly evaluated the consistency of the treating physician's opinion with the remaining medical evidence, including the source's own treatment notes, in accordance with the *Burgess* factors.  *See Johnson v. Comm'r of Soc. Sec.*, 669 F. App'x 580, 581 (2d Cir. 2016) ("ALJs are not required to give controlling weight to opinions that are not consistent with other substantial evidence in the record.") (citing *Halloran*, 362 F.3d at 32).  The ALJ's RFC assessment diverged from Dr. Koretsky's opinions that Gonzalez was extremely limited in her ability to make judgments on simple work-related decisions and respond appropriately to usual work situations and to changes in a routine work setting.  AR at 972–73.[14]  As identified by the ALJ, Dr. Koretsky's own treatment

---

[14] Although this analysis focuses on the aspects of Dr. Koretsky's opinion that the ALJ did not incorporate into the RFC, it is also worth noting that there are several aspects of the opinion that *were* incorporated into the RFC or otherwise accounted for in the vocational expert's testimony.  For example, Dr. Koretsky opined that Gonzalez was extremely limited in her ability to carry out complex instructions and make judgments on complex work-related decisions.  *Id.* at 972.  The ALJ accounted for this opinion in limiting Gonzalez's RFC to "understanding, remembering and carrying out simple and routine and repetitive, non-complex tasks."  *Id.* at 34.  Additionally, Dr. Koretsky opined that Gonzalez was markedly limited in her ability to interact appropriately with supervisors, co-workers, and the public.  *Id.* at 973.  The vocational expert accounted for this limitation at the hearing when she stated

notes contain little evidence and no mental status examinations that demonstrate difficulty in making judgments or responding appropriately to changes. *Id.* at 36. Indeed, the majority of Dr. Koretsky's notes concern Gonzalez's struggles with depression and anxiety as related to her pain, and none of the treatment notes detail any situations in which she exhibited poor judgment or decision-making. *Id.* at 630–33, 650–51, 681–91, 726–41, 890–95, 971–75, 1056–67, 1068–118. The only increases in Gonzalez's depressive symptoms detailed in the treatment notes coincide with occasions during which she was unable to access her medication, and Gonzalez often felt "a little better" when she had access to her medication. *Id.* at 732, 734–37, 739, 741.

Furthermore, as the ALJ recognized, Dr. Koretsky's opinion was inconsistent with other opinions in the record, including those of Drs. Miskin and Antiaris. *Id.* at 36. Based on his observations that Gonzalez displayed "no overt evidence of a thought disorder" and had intact faculties, cooperative behavior, appropriate affect, good comprehension, insight and judgment, and normal thought processes, Dr. Miskin opined that Gonzalez had a "mild partial psychiatric disability." *Id.* at 782–83. Dr. Antiaris conducted a mental status examination of Gonzalez and found that she had a dysphoric affect and euthymic mood, but was cooperative, related adequately, spoke fluently and clearly, appeared well groomed with normal posture and motor behavior, and appropriate eye contact, and had coherent and goal-

---

that, if an individual with the limitations posed could only occasionally interact with the public, supervisors, and coworkers, positions such as a document preparer or final assembler would remain available to the individual. *Id.* at 401.

directed thought processes with no evidence of hallucinations, delusions, or paranoia. *Id.* at 65–54. Dr. Antiaris opined that Gonzalez was not limited in her ability to follow and understand simple directions and instructions, make appropriate decisions, or relate adequately with others, and was only mildly limited in her ability to maintain attention, concentration, and a regular schedule, and learn new tasks and perform complex tasks independently and appropriately deal with stress. *Id.* at 654–55.

Where, as here, the severity of the restrictions assessed by a treating physician is unsupported by his own treatment notes and other evidence in the record, the ALJ is not required to give his opinion controlling weight. *See, e.g.,* 20 C.F.R. § 404.1527(c)(3) ("[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion"); *Deschamps v. Comm'r of Soc. Sec.,* No. 2:15-CV-190 (JMC), 2016 WL 4367955, at *7 (D. Vt. Aug. 16, 2016) (in assigning treating physician's opinion little weight, ALJ properly considered that opinion was "inconsistent with and unsupported by the Doctor's own treatment notes"). Despite the fact that Dr. Koretsky is Gonzalez's treating physician, substantial evidence supports the ALJ's decision to assign little weight to Dr. Koretsky's opinion. Accordingly, Gonzalez's argument that remand is necessary due to the ALJ's failure to abide by the treating physician rule as to Dr. Koretsky is without merit. *See, e.g., Schmidt v. Colvin*, No. 15-CV-2692 (MKB), 2016 WL 4435218, at *12 (E.D.N.Y. Aug. 19, 2016) (upholding ALJ's decision to accord little weight to opinion of treating

psychiatrist because it "was not supported by his own treatment records, which show that Plaintiff reported responding well to his medication, had repeatedly normal mental status examinations, and was consistently assessed as mentally stable"); *Evans*, 110 F. Supp. 3d at 536 (finding substantial evidence to support ALJ's decision to give little weight to opinion of treating therapist where plaintiff had a "conservative treatment history," and treatment records "consistently show[ed] stable mental examination findings and that [the plaintiff's] anxiety [was] controlled with Xanax") (internal quotation marks omitted).

### 3.  The ALJ Properly Assessed Gonzalez's Credibility

Gonzalez argues that, although the ALJ found that her allegations concerning the severity of her symptoms were not consistent with the record as a whole, AR at 39, her "repeated efforts to seek treatment from her physicians strengthen the credibility of [her] account of the intensity and persistence of her symptoms."  Pl. Mem. at 27.  Once again, however, the ALJ's credibility determination is supported by substantial evidence.

While "[i]t is the function of the [Commissioner], not the [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant," *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (alterations in original, citation and internal quotation marks omitted), the "ALJ's decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the ALJ gave to the

individual's statements and the reasons for that weight." *Cichocki v. Astrue*, 534 F.

App'x 71, 76 (2d Cir. 2013) (internal alternations and quotation marks omitted).  So

long as the ALJ provides a sufficiently specific rationale for finding a claimant's

testimony not credible, the decision is "generally entitled to deference on appeal."

*Selian*, 708 F.3d at 420.

In assessing a claimant's credibility, an ALJ must consider all available

evidence, while providing "specific reasons for the weight accorded to the claimant's

testimony." *Alcantara v. Astrue*, 667 F. Supp. 2d 262, 277 (S.D.N.Y. 2009) (citations

omitted).  The regulations direct the ALJ to consider information regarding: (i) the

claimant's daily activities; (ii) the location, duration, frequency, and intensity of his

or her symptoms; (iii) any precipitating and aggravating factors; (iv) the type,

dosage, effectiveness, and side effects of any medications taken; (v) treatment other

than medication used to relieve the claimant's symptoms; (vi) any measures used to

relieve his or her symptoms; and (vii) other factors concerning functional limitations

and restrictions resulting from the claimed symptoms.  20 C.F.R. §§ 404.1529(c)(3),

416.929(c).

Here, the ALJ addressed the relevant legal standard and adequately

explained her credibility determination.  *See Britt v. Astrue,* 486 F. App'x 161, 164

(2d Cir. 2012) (explicit mention of 20 C.F.R. § 404.1529 and SSR 96–7p established

that ALJ used proper legal standard in assessing claimant's credibility).  As to

Gonzalez's daily activities, the ALJ found that they are "not limited to the extent

one would expect, given the complaints of disabling symptoms and limitations,"

because Gonzalez is able to cook, clean, and manage her household, "yet requires some help due to pain," which the ALJ accounted for in the RFC determination. AR at 39. The ALJ additionally found it to be "notabl[e]" that Dr. Kim described Gonzalez's "poor effort" during testing, *id.* (citing *id.* at 793), and cited to the fact that no non-conclusory opinions in the record indicated that Gonzalez was currently disabled. *Id.* at 39. Finally, the ALJ concluded that Gonzalez's alleged symptoms were not consistent with the objective evidence in the record, including examinations by Dr. Pflum, which revealed a fair range of motion in the cervical spine and normal motor function, and Dr. Schwartz, which revealed normal activities of daily living and a normal gait. *Id.* (citing *id.* at 883, 919).

Although Gonzalez objects to the ALJ's failure to mention her repeated visits to Dr. Kayal and referrals to physical therapy in the context of her credibility determination, Pl. Mem. at 26–27, the ALJ did consider her treatment generally. *See* AR at 39 (noting that, while Gonzalez has received treatment for her impairments, such "treatment has been essentially routine and/or conservative in nature," and would not prevent her from engaging in the stated RFC). In any event, even if the ALJ had not explicitly mentioned Gonzalez's attempts to seek treatment, "[f]ailure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that [s]he considered the entire evidentiary record." *Judelsohn v. Astrue*, No. 11-CV-388S, 2012 WL 2401587, at *6 (W.D.N.Y. June 25, 2012). Based on all the reasons given by the ALJ, the Court concludes that

69

the ALJ's credibility finding is supported by substantial evidence in the record and complies with the SSA regulations.

### 4.  The ALJ Fully Developed the Record

Finally, Gonzalez argues that the ALJ failed to fully develop the record because it does not include a function-by-function analysis from every treating physician.  Pl. Mem. at 27–28.  However, as the Commissioner correctly notes, an ALJ is not required to affirmatively seek additional medical records when the administrative record is "adequate for [the ALJ] to make a determination as to disability."  Def. Mem. at 29 (quoting *Perez v. Chater*, 77 F.3d at 48; *Rosa*, 168 F.3d at 79 n.5 ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.")).

Here, the record contained hundreds of pages of treatment notes and medical opinion evidence from orthopedic surgeons, pain management specialists, neurologists, psychiatrists, psychologists, independent medical examiners, and consultative examiners.  AR at 593–1149.  Furthermore, the Second Circuit has held that an ALJ does not have "any further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians" where, as here, the ALJ's RFC determination is largely supported by opinions from at least one consultative examiner and the administrative record contains treatment notes from the claimant's treating physicians. *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013).  Gonzalez does not identify, and the Court cannot find, any "gap" in the

record that would require the ALJ to seek further information before finding Gonzalez to be disabled. *Rosa,* 168 F.3d at 79 n.5. Thus, remand is not warranted on this basis.

## III.  CONCLUSION

For the foregoing reasons, Gonzalez's motion for judgment on the pleadings is denied and the Commissioner's cross-motion is granted. The Clerk is directed to deny the motion at Docket Number 13, grant the motion at Docket Number 19, and enter judgment for the Commissioner.

**SO ORDERED.**

Dated: September 16, 2020
   New York, New York

_____
JAMES L. COTT
United States Magistrate Judge